# THE MATTER OF ARBITRATION

RECEIVED

DEC 3 1 2015

Stoel Rives LLP

|  |  |  |
|---|---|---|
| MutliCare Health System (Tacoma General Hospital) v. | ) ) ) ) ) | |
| Washington State Nurses Association (WSNA) | ) ) ) ) ) | Opinion and Award Douglas P. Hammond December 28, 2015 |
| _____ | ) | |

## APPEARANCES

For the Employer

Karin Jones, Attorney
Timothy O'Connell, Attorney

For the Association

Danielle Franco-Malone, Attorney
Carson Flora, Attorney

## INTRODUCTION

On September 12, 2013 MultiCare Health System (the Employer, MultiCare, Tacoma General) and the Washington State Nurses Association (WSNA, Association, Union) entered into a Settlement Agreement (Agreement) (JX2)[1] of a lawsuit filed by the Association pertaining to the lack of provision(s) for rest breaks for nurses as provided for in the collective bargaining agreement (JX1) and as required by state law. The Agreement applied to nurses represented by the Association employed by MultiCare in all departments affected by the lawsuit.

On April 14, 2014 the Association filed a grievance alleging a violation of the settlement. The grievance claimed a violation of both the settlement and the agreement…"including, but not limited to the Settlement Agreement, (and), Article 8.5 Meal & Rest Periods…" (JX 4)

---

[1] [1] For purposes of identification, Joint Exhibits are designated "JX _. Employer exhibits "EX _; Union Exhibits UX _.

1

Exhibit F, Page 1060 of 1092

The parties followed the contractual grievance procedure but failed to reach a mutually acceptable accord. The matter was presented for Arbitration pursuant to Article 14.3, Step 4 of the agreement as well as Section 3, (*Additional Provisions*) (d) of the Settlement Agreement[2]. Hearings were held in Tacoma, Washington on August 17, 18; September 24, 25; and October 19, 2015 before the undersigned Arbitrator. The parties were afforded a full and fair hearing, including the opportunity to present evidence, examine and cross examine witnesses, provide documents and make arguments in support of their respective positions. The parties agreed that the grievance was properly before the Arbitrator and further stipulated that nothing in the contract prevents the Arbitrator from rendering a decision and determining a remedy based on the facts, testimony and evidence. Timely and helpful briefs, which were fully considered, were received from the parties, via e-mail, on December 2, 2015. Upon receipt of the briefs the hearing was closed.

## ISSUE

At the hearing the parties could not agree on the issue to be decided. Therefore, they mutually consented to allow the Arbitrator to determine the issue. Based on the evidence presented and testimony provided, I find the issue to be:

Did the employer violate the settlement agreement by failing to adopt and provide mechanisms, practices or policies procedures that would give the opportunity and means for the represented nurses to take their rest breaks as provided for in the agreement? If so, what is the appropriate remedy?

---

[2] 3. Additional Provisions (d) "The interpretation and enforcement of the Agreement shall be governed by the laws of the State of Washington. Any disputes arising out of this Agreement shall be submitted to the grievance procedure of the applicable collective bargaining agreement, culminating in final and binding arbitration, if necessary."

2

# RELEVANT LANGUAGE

<u>The Collective Bargaining Agreement</u>

Article 1 – Recognition

The Hospital recognizes the Association as the exclusive collective bargaining representative for all registered nurses employed by the Hospital as regular full-time and part-time staff nurses, excluding supervisory and managerial employees, employees assigned to Nursing Administration, and all other employees.

Article 2 – Management Responsibility

2.1 The Association recognizes the rights of the Hospital to operate and manage the Hospital, including but not limited to the rights to establish and require standards of performance; to maintain order and efficiency; to direct nurses; to determine job assignments and working schedules; (subsequent parts omitted-----); provided such rights, which are vested solely and exclusively in the Hospital, shall not be exercised so as to violate any of the specific provisions of the Agreement

Article 8 - Hours of Work and Overtime

8.1 <u>Work Day.</u>  A normal workday shall consist of eight (8) hours work to be completed within eight and one-half (8 ½) consecutive hours.

8.2 <u>Work Period</u>.  The normal work period shall consist of eighty (80) hours within a fourteen (14) day period.

8.3 <u>Innovative Work Schedules</u>.  An innovative schedule is defined as a work schedule that requires a change, modification or waiver of any provisions of the Employment agreement.  Written innovative work schedules may be established by mutual agreement between the Hospital and the nurse involved.... Current innovative shifts are set for out in Appendices A, B, and C to this agreement. [3]

8.5 <u>Meal and Rest Periods</u>.  Meal periods and rest periods shall be administrated in accordance with state law (WAC 296-126-092).  All nurses shall be allowed an unpaid meal period of one-half (1/2) hour.  Nurses required by the Employer to remain on duty or return to their nursing unit to perform nursing duties during their meal period shall be compensated for such time as the appropriate rate of pay.  All nurses shall be allowed a paid rest period of fifteen (15) minutes for each four (4) hours of working time.

---

[3] Although the contract reads as written , Appendix C does not refer to innovative work schedules.

Exhibit F, Page 1062 of 1092

Article 14 – Grievance Procedure

14.1 <u>Grievance Defined</u>. A grievance is defined as an alleged breach of the terms and conditions of this Agreement. It is the desire of the parties to this Agreement that grievances be adjusted informally wherever possible and at the first level of supervision.

14. 2 – 14. 3  Step 3   Omitted

14. 3 <u>Arbitration</u>. If the grievance is not settled on the basis of the foregoing procedures, and if the grievant and the Association have complied with the specific time limitations specified in Steps 1, 2, 3, and 4 herein, the Association may submit the issue in writing to arbitration within fourteen (14) calendar days following the receipt of the written reply of the Director of Labor Relations or designee.... The arbitrator's decision shall be final and binding on all parties. The arbitrator shall have no authority to add to, subtract from, or otherwise change or modify the provisions of this Agreement, but shall be authorized only to interpret existing provisions of this Agreement as they may apply to the specific facts of the issue in dispute... (remainder omitted).


<u>The Settlement Agreement</u>

Entered in the record, as Joint Exhibit 2, relevant portions of this Agreement shall be referenced *infra*, when appropriate.


# BACKGROUND

A lawsuit was filed, by two individuals, on June 11, 2010, against MultiCare alleging a violation of various provisions of the appropriate RCW[4] by "failing to pay registered nurses for missed rest and meal breaks." Subsequently joined by the WSNA, in a lawsuit seeking monetary damages for failure to pay for hours worked resulting from missed rest breaks, the complaint was later consolidated into a Class Case on December 17, 2010. After good faith and effective negotiations, including mediation, the parties agreed to settle the lawsuit. The Settlement (JX2) included provisions that included the following and required:

---

[4] Revised Code of Washington

4

1. <u>MultiCare's Obligations.</u> MultiCare to agree to both retroactive and prospective relief to benefit the nurse.

a. Missed Breaks Process to be put into effect by or before the completion of MultiCare's scheduled system wide introduction of the Kronos time-keeping system, currently scheduled to begin in 2014:

(1)     Managers of each department or unit of Tacoma General Hospital and Good Samaritan Hospital will adopt mechanisms, practices or policies that assure each Represented Nurse is relieved of patient care duties for a 15 minute rest period every four hours of work. In no case shall the mechanism used result in a violation of the staffing plan established by the Nurse Staffing committee. Represented Nurses will work cooperatively to implement whatever mechanisms are used in each department or unit. Except in exigent circumstances, RN's will accept a rest break when relief is provided and, in the RN's judgment, patient needs will be met and is consistent with the Nurse Practice Act.

(2) MultiCare will provide a simple electronic timekeeping system for the Represented Nurses to record missed breaks. The Nurse shall record a missed rest break by making an appropriate electronic entry associated with each missed rest break and enter the relevant reason and shall only be required to record a missed break one time. Management approval shall not be required in order for a nurse to record or be paid for a missed break.

(3) Omitted

(4) In the rare case that a missed rest break occurs, the missed rest breaks shall be treated as hours worked and will be compensated at (sic) rate of 15 minutes of overtime pay when the missed rest break, counted as if it were additional hours worked, causes the Represented Nurse to exceed forty hours in the work week (or more than eight hours in the day for a nurse on "8/80" schedule)("Statutory Overtime").

(5)     Omitted

(6)     MultiCare will track and provide WSNA department-level data on missed rest breaks on a quarterly basis.

The Settlement Agreement also contained language requiring each department to train all employees in the procedures for rest breaks. Topics to be included in this training were listed in Subsection (b), 1 – 5 as follows:

(1)     Use of the timekeeping system for documenting missed breaks.

5

(2)    Each unit's/department's determination as to how it will comply with the process and create unit specific procedures for assuring that the Represented Nurses receive rest breaks.

(3)    Education on the importance of Represented Nurses taking all their rest breaks and the right of the Represented Nurses to record and be paid for missed rest breaks without fear of retaliation.

(4)    Training of managers of their responsibility to create conditions which assure the Represented Nurses take their breaks.

(5)    Training of managers that emphasizes that MultiCare will not tolerate retaliation against any Registered Nurse who records a missed rest break or requests relief to take rest break.

And as noted, *supra*, in footnote 3:

3. Additional Provisions:

(a)    Omitted

(b)    ...Without limiting the foregoing the parties expressly agree and acknowledge that this Agreement is not intended to in any way address or apply to the legality or propriety of intermittent as opposed to uninterrupted rest breaks.

(c)    Omitted

(d)    The interpretation and enforcement of this Agreement shall be governed by the laws of the State of Washington.  Any disputes arising out of this Agreement shall be submitted to the grievance procedure in the applicable collective bargaining agreement, culminating in final and binding arbitration, if necessary.

(e) – (h)  Omitted

The Settlement was the result of vigorous, thorough and extensive negotiations, between the hospital and WSNA.  Led by lead councils, Mr. O'Connell, for the hospital and Ms. Flora, for the union, both witnesses during this hearing, the parties met a number of times, including a session in mediation, in an effort to resolve the law suit.  Signed on September 12, 2013, the application of its terms, and the subsequent implementation of the settlement led to this instant grievance. A specific break system, including the break buddy system, although discussed, was not a part of the

6

settlement. MultiCare did not abandon its position that the buddy system is a viable and workable solution to the break problem, and therefore one of the potential mechanisms available. Nor did the WSNA accede to the explicit inclusion of this system as a means to resolve their continuing concerns regarding rest breaks. It remained, unspecified, as one of the possible choices a department or unit could choose to adopt and utilize in providing the requisite rest breaks.

Further, the parties, in attempting to reach the settlement, exchanged a number of proposals regarding staffing. WSNA sought language that would generate staffing increases if certain criteria were met. MultiCare, according to testimony, was adamant that they would not agree to anything that would mandate increased staffing. The WSNA was successful in including a protection against violating the terms of the staffing committee's staffing plan

The Settlement was not implemented until a new time keeping process, titled KRONOS became effective. In April, 2014 Human Resources issued documents, titled KRONOS REST AND MEAL PERIODS (EX 35) and KRONOS TIMEKEEPING AND SCHEDULING (EX 36). The former included a Policy Statement and a Procedure regarding breaks. It reads, in part:

Policy Statement: Rest and meal periods are provided and scheduled in accordance with State and Federal wage-hour laws and MHS policy.

Procedure:

I. Rest Periods:
    A. Employees shall be allowed a paid rest period of 15 minutes for each four hours of working time. The rest period shall be scheduled as near as possible to the middle of the work period and away from the work setting. Ideally, this means a fifteen-minute rest break during the first four hours of work, and a second fifteen-minute break for each additional four-hour period of work.

7

B.  Where the nature of the work allows employees to take intermittent rest periods equivalent to fifteen minutes for each four hours worked, scheduled rest breaks are not required.

C.  Omitted

D.  No employee shall be required to work more than three hours without a rest break.

E.  Missed rest periods must be reported by the employee to the supervisor via the time and attendance system at the end of each work period through attestation.

II.  Meal Periods

A – F  Omitted

III. Nursing Mothers

A – C  Omitted

The evidence presented in the hearing pertained to the allegation of missed breaks at MutliCare's Tacoma General Hospital.  Research showed the Hospital is a general medical and surgical hospital in Tacoma, WA, with over 400 beds.  The bargaining unit consists of about 800 – 1000 full and part time registered nurses.  A number of specialty healthcare services are provided, including a trauma center, neonatal and adult intensive care, and cardiac care.  Data for the latest year available shows that 64,297 patients visited the hospital's emergency room. The hospital had a total of 18,739 admissions. Its physicians performed 4,715 inpatient and 10,071 outpatient surgeries.[5]

Washington State law (RCW 70.41.410, etc.) has required, since September, 2008, each hospital establish and maintain a nurse staffing committee comprised of one-half registered nurses currently involved with patient care and at up to one-half members of hospital management.  The primary functions of this committee is to develop and provide oversight regarding a nurse staffing plan for each unit and shift based on patient care needs,

---

[5] According to US News and World Report (Health), undated article.

appropriate skill mix of the registered nurses and other nursing personnel, and layout of the unit. A semi-annual review of the plan against patient needs and staffing information including sensitive quality indicators collected by the hospital is required. Further the committee reviews, assesses and responds to staffing concerns presented to the committee, frequently submitted by the various unit-based councils (UBC). The plan is compiled from information reflecting each unit's average daily census, and hours per patient day. The latter is a measurement based on average patient acuity in each unit. The committee produces an annual staffing plan and if not adopted by the CEO of the hospital a written explanation must be provided explaining the reasons for not acceptance. (see UX 29).

Hospitals are required to post the staffing plan and nurse staffing schedule for each shift and unit in a public area. Such plans must be made available to the patients and visitors upon request. Hospitals may not retaliate against employees who are involved in the nursing committee or against anyone (nurse, patient, etc.) who notifies the hospital of concerns regarding nurse staffing.

According to Washington State law, (WAC 296-126-092)) employees are to be provided with a one half hour, nonpaid break (meal break) per 8 hours shift and a 10 minute paid break for every four hours worked. The contract here allows for 15 minute breaks and is addressed in Article 8, Section 5 of the contract. A number of WSNA witnesses testified about their specific experiences related to rest breaks during their shifts.

It is the hospital policy that rest breaks may be taken on an intermittent basis. For example, a nurse may break for five minutes and then take a separate, non-consecutive break of 10 minutes, therefore to have been considered as having received the authorized 15 minute break.[6] The WSNA's

---

[6] An example of this may be a five minute personal phone call or quick trip to the bathroom, then a longer, 10 minute break, for a refreshment.

Exhibit F, Page 1068 of 1092

stance is that the breaks must be for 15 consecutive minutes and that nurse's should claim a missed break if their break is for anytime less than that allowed by the contract. Although addressed in the settlement, (Section 3 (b) the contract is silent on this matter.

A former Tacoma General nurse, Anna Bowman, with approximately 25 years employment in the Cardiac Care Unit (CCU), stated that she was told, by nurse management, to use a "buddy" when seeking a break opportunity or to ask another RN to cover the care of her patients while she took her authorized break. With an expected nurse/patient ratio of 1/4, and the need for consistent monitoring of her assigned patients, it was difficult to expect another nurse, with the same expectations of ratio and care, to cover for her during the 15 minutes she would be gone from the patient floor. Nor can a nurse expect the Charge nurse to assist as they frequently have their own patient demands and other duties. Auxiliary personnel, such as a Certified Nurse Assistant (CNA) and others, lack the proper nursing credentials to effectively substitute for the RN for the purpose of taking a break. A number of factors regarding patient care were presented that would make it difficult for a nurse, in this unit, to easily break or cover for a nurse colleague.[7]

On March 28, 2014, Ms. Lescia Meyers, described by Ms. Bowman as the manager of the Cardiovascular Intensive Care Unit (CVICU) and the CCU, wrote in email to all nurses, titled, "Break Time Clarification" (UX16). In the email, Ms. Meyers wrote:

    "It is the expectation that each staff member takes his or her 15 min breaks and 30 min lunch breaks each shift. Although it seems as if there is always something to do, break times must be made a priority and scheduled as part of your daily workflow. Each person is responsible for collaborating with his/her coworkers so that he/she may take all of his/her entitled breaks. If, during your shift, you think you will be unable to take your break/lunch, please see the Charge RN ***in advance*** so that you may work together to develop a break plan..."  (Included, as part of this email was a form, titled,

---

[7] According to the data provided in EX 5, Ms. Bowman recorded and was paid for 78 missed breaks during two week pay periods from late September 2013 to late March 2015.

"Time Card Supplemental Documentation," to be turned into the charge nurse, when the nurse and the charge nurse cannot agree on a plan for breaks. It allows for explanations and reasons for the lost break.)

This email was further clarified, by Ms. Meyers, via a subsequent email, five months later, dated August 15, 2014, after a number of nurses where unable to get their breaks or lunch. (EX4) She noted that the forms, attached to her earlier email, were not being submitted explaining reasons for the missed breaks. After cautioning the need to fill out the forms, the email contained the following:

"Covering someone for break means watching their patients to cover any urgent/emergent needs while their primary caregiver is off the floor. For example, break through pain meds, chest pain, blood sugar concerns, IV pumps, answer call lights, etc.

It does NOT mean you are assuming responsibility for the complete care of those patients. You are not completing assessments, not administering scheduled medications, not answering phone calls/questions from the MD or family, and not competing routine vital signs.

In order to be a good break buddy, before going on break all patients should be rounded on and needs addressed prior to you leaving the floor. A brief report should be given to your buddy and your ascom phone should be handed off to the person covering.

When you are covering for your buddy, receive a brief report (code status and pertinent concerns), take the ascom phone (and carry it with you). Both staff should clarify what time to expect the person back from break."

In testifying about her recollections regarding the application of the buddy system, the witness contended that the functions listed as needed to be observed, e.g. break through pain meds, chest pain, blood sugar concerns, etc. were not simple tasks but were actual patient care needs regardless of the urgency involved. In "reporting" to the substitute nurse prior to the "hand-off", Ms. Bowman stated that the report consisted of, the patient's name, room number, diagnosis, physicians name, procedures scheduled for that day, code status, blood sugar status, and whether the patient was diabetic. She regularly took her breaks on the unit, in proximity to her

11

assigned patients and could be called from her break if an emergent need arose. Although testifying that she used the "buddy break" system, she admitted to discomfort with this process because of her belief in the professional responsibility of primary patient care. When assigned to care for a patient, even when relieved for a break, she maintains that she has continued full responsibility.

Ms. Bowman testified that she recalled that about five years previously Tacoma General provided for a nurse to be scheduled to begin work about 11:00 AM and functioned as a type of break nurse who's duties, absent a group of assigned patients, included substituting for nurses, allowing them to take their 15 minute breaks. This practice was not continued for unknown reasons. Now employed at an outpatient surgery center for orthopedics, Ms. Bowman stated that at her present place of work, receiving breaks is a part of the schedule for RN's.

Another witness for the WSNA, RN Christopher Johnston, worked at various times in the CCU, ED and CVICU, over a period of 8 years. He testified to missing a large number of rest breaks while in the ED. Mr. Johnston's ED schedule included 5, 12 hour shifts (2 days one week; 3 the next) over a two-week pay period.[8] (EX8). These missed breaks were primarily, according to Mr. Johnston, due to the availability of only one scheduled float nurse. He estimated that during the period he worked in the ED he was only able to take his breaks 10 to 20% of the time. Further, he stated that the rate of turnover within the ED, over "the past year of so", increased with at "at least 20 (nurses)".

A diabetic, Mr. Johnston explained the need for him to take periodic breaks to check the status of his own well being. Without appropriate and timely

---

[8] This schedule, with 3 breaks of 15 minute each for each 12 hour shift, multiplied by 5 shifts would equal 15, 15 minute breaks during the two weeks. Employer Exhibit 8 (EX8) lists Mr. Johnston's missed breaks, from pay periods 9/7/13 to 3/21/15. Of the approximately 615 possible 15 minute breaks during this time, Mr. Johnston claimed payment for approximately 426 missed breaks, or about 69%. There was a variance in recorded missed breaks on 4 occasions, which may have been due to double shifts.

12

breaks, he was in peril of an imbalance in this sugar level, with its attendant results.

Mr. Johnston also shared his views and experiences in the CVICU where nurse/patient ratio can be 1/1 or 1/2 depending on the status and acuity of the patient's health. He testified that at various times nurses cover for breaks of their colleagues, but explained his concerns with the increased ratio of 1/2 to 1/4 when coverage occurs. In CVICU the patients, by being assigned to that particular unit, require more specific and vigilant care.

Charlene Sole, an experienced RN working in the ED, stated that a float nurse is typically scheduled to relieve nurses for their lunch and rest breaks. This system, due to the workload in the ED as well as apparent scheduling problems has not been working in regard to rest breaks. She testified that she has missed a number of rest breaks and has submitted an Assignment Despite Objection (ADO) [9], including the narrative, "...when I feel it's unsafe, you know. I feel like I've been worked, I haven't gotten a break, I haven't gotten a snack. I don't feel like I can properly to (sic) really take care of the patient safely." Ms. Sole stated that the problem with ED nurses not being able to take their rest breaks has had an impact on employee morale. She also stated that there have been times, when offered a break, that she refused due to the immediate needs of a patient, and if not able to subsequently receive the break, she records it as a missed break.

According to Ms. Thomasson, the assistant nurse manager in the ED, the system applied for rest/lunch breaks is not the buddy system, but the use of a float person to relieve the "breaking" nurse. Earlier an attempt had been made to designate a float position, as an added shift, with the responsibility of relieving nurses for lunch/rest breaks. It apparently did not succeed as

---

[9] An Assignment Despite Objection (ADO) – is a WSNA form developed and used to document objections regarding a nurse's evaluation of a circumstance that, in the nurse's opinion, affects patient care. It is used for all purposes of concern by a nurse, not just for missed rest breaks. It is available for all nurses in hospitals where the nurses are represented by the WSNA.

Exhibit F, Page 1072 of 1092

nurses chose not to bid on the position, as better options were available. In order to address the break problem in the ED, in June 2015, a staff member, at Ms. Thomasson's request, devised a plan that redesigned the roster into teams that would "partner up and offer support to each other..." Presented as evidence (EX 43) this plan purported to allow for adequate scheduling of lunch breaks for each scheduled nurse using float nurses as relief. Based on the daily roster, the staff "huddles'", and determines staff assignments, allowing the nurses to supposedly know when their breaks occur. The actual plan did not specifically note times for rest breaks, other than an assigned roster position of float nurse responsible for breaks (including rest breaks), as the scheduling of rest breaks was contingent on patient need.

However, in answer to questions regarding the schedule, Ms. McGauley, an ED nurse, who has worked on occasion, as both a charge nurse and a float nurse, stated she was familiar with the document, but not been told, when in either of these roles, to specifically use the "schedule" as means to provide breaks for nurses in the ED.

A document titled "Location Schedule" was introduced as an example how breaks, both lunch and rest, were be accounted for in the ED. (EX 45)[10] During this testimony, the employer presented a colored bar graph showing the number of expected breaks and the number of missed breaks, comparing four pay periods from September 2014 and September 2015. The graph indicated a decrease in missed breaks compared to expected breaks from 79% (Sept 2014) to 54% (Sept 2015) (EX 46).

Ms. Thomasson contended that the system developed (represented by EX 43) is working as expected. However, she noted that the number of breaks continued to be missed, over one half as of pay period in September 2015,

---

[10] Ms Thomasson stated in her testimony that this form is no longer in use. A new form, with more columns, is now in use. Why was this newer version was introduced? A completed current example of this form, with "check" marks, would have been helpful here in understanding the form's utility and application.

Exhibit F, Page 1073 of 1092

are indications of the unpredictable nature of the needs of the department not the ineffectiveness of the float nurse/break system. Census prediction is difficult in the ED due to the nature of the patient requirements.

Another witness for the union, Ms. Leanne Leman, an experienced RN from the Surgery Department (OR), testified about the break process in her area of work. In contrast to the apparent patient requirements in the other areas, E.G. ED, CVICU, CCU, Perinatal, and Birth Center, she testified to a system of that included a nurse, described as a facilitator, or one who relieved other nurses in the OR, to allow for breaks. This position, according to Ms. Leman, easily "took over" for the nurse, either while in the OR or outside of the operating theatre, to allow for the requisite breaks. During the time period involved here, from December 2013 to March 2015, Ms. Leman claimed payment for 6, 15 minute missed breaks.

Ms. Terri Williams, a nurse representative for WSNA, was responsible for the representation of the nurses at Tacoma General, from 2011 to 2014, a period that included the date of the lawsuit settlement regarding the break issue. She testified, while presenting of a number of Assignment Despite Objection forms (UX 18) that the lack of opportunity to take breaks continued to be a problem subsequent to the effective date of the settlement. These ADO's were given to the WSNA, with copies to the nurse's manager and were typically discussed at the monthly conference committee meetings as possible problems needing solution. Ms. Williams stated that she received about 80 to 100 of these each month, with about half dealing with missed rest breaks. UX 18 represents samples of these ADO's. She also testified regarding an email exchange between Nurse Manager Myers and RN Braeger which admonished the nurse for failing to arrange for breaks and subsequently, cautioned discipline if the breaks were not properly arranged and taken (UX20). Ms. Williams, in her role as nurse rep, filed the instant grievance, at step two, as an organizational grievance (JX4).

15

According to Jan Moon, a RN employed in the Birth Center, a large number of the patients who come to Tacoma General to deliver their babies have health problems that can make the birthing process more difficult and requires more than normal diligence during the labor procedure. Due to the difficulty of most of the pregnancies, the ratio of nurse to patient is usually 1/1 or 1/2 depending on the acuity of the patient's health problem.

She testified that the expectation in her unit is that the nurses cover for each other to allow for rest breaks during their shift. Characterized by Ms. Moon, as "We've been asked to do kind of the buddy system, buddy up with another nurse, to break each other." This method, according to Ms. Moon, makes it difficult to care for more than one patient, even with monitors. If a patient needs specific care, this takes away from observing and caring for the second patient, that patient who was assigned to the nurse currently away on break. Ms. Moon stressed her views on the need to take a break, "Getting a mental break from watching the monitor, I think, is really important. Most of the nurses probably would say the physical work is fine, they could do the physical work, but just getting that mental break...." The opportunity to take a break by being relieved by another nurse is exacerbated by the physical layout of the new Birth Center (since Feb) as it is now harder to see other nurses and their patients.

Ms. Moon has worked as a per diem nurse at St. Joseph's Hospital (another Tacoma hospital) where, in her view, they delivered more babies per month than Tacoma General. The hospital scheduled a break nurse with the apparent function of specifically allowing all nurses in the birth center to receive their planned breaks. She missed very few breaks there.

Ms. Terry Surratt is an RN working in Tacoma General's Perinatal Special Care Unit (PSCU), an area within the Birth Center dedicated to extraordinary care for especially challenging pregnant patients. She is also the Local Unit

16

Chair for WSNA.[11] Ms. Surratt testified that when busy she and her colleagues are expected to use the "buddy system" to provide each other with the allowable rest breaks. She stated that this is not always available, when the unit is busy, due to patient requirements and the expected ratio of 1 nurse to 3 or 4 patients. This expectation that nurses cover patient care when relieving each other for rest breaks was not safe as it doubled patient coverage. She wrote of these concerns in an email to WSNA Representative Williams (UX 23) and testified that "taking her phone on break so her patients could call her," as directed by Assistant Nurse Manager Jones (noted in her email), "was not really a break." In her view, the only thing that has changed since the Settlement has been the issuance of phones. The PSCU has seemingly become busier, and with her view of the existence of understaffing in the unit, it is harder of receive breaks.

In her role as Local Unit Chair, Ms. Surratt has participated in numerous discussions with hospital management, in conference committee meetings and elsewhere about the problems with breaks. She contends that the discussion is either tabled due to the pending arbitration, or the management argues that the break buddy system is a viable solution. When confronted with the argument that this system makes the ratio of nurse to patient unsafe, she contends that the hospital argues they've "been using break buddy system for a long time and it's worked just fine."

Ms. Stephen-Selby, the Assistant Executive Director of Nursing Practice, Education and Research, for the WSNA, testified regarding numerous studies showing the relationship between nurse staffing problems and fatigue on the job, and how it can potentially affect work to a staff nurse, especially regarding the wellbeing of the assigned patient. Using the Ms. Schleder's doctoral dissertation (UX 27) as a specific source, Ms. Stephen-Selby referred to the extensive selective list of written work complied regarding work schedules and fatigue in nursing. Among these were several studies showing

---

[11] This is the highest elected or selected RN leadership position, at the local level, for WSNA.

Exhibit F, Page 1076 of 1092

the effect of rest/lunch breaks, both taken or not, on health issues for nurses and on the job errors in patient treatment. According to the witness, the American Nurses Association (ANA) shares this concern regarding errors and fatigue by nurses. An abstract of the studies, however, contradicts this and suggests that "skipping breaks and/or meal periods was not associated with a higher risk of making errors, there are other compelling reasons for a nurse to take breaks (EX 16).

Mr. Tim O'Connell, a partner in the law firm representing MultiCare, testified about the history of negotiations regarding the Settlement Agreement, and specifically the process of how breaks would be provided. His recollection included, "...we specifically attempted to identify a number of policies that could be utilized...to include...the buddy system. ...WSNA would not agree to include that in the Settlement Agreement, but we were equally insistent that we utilize the buddy system and we continue to do so. And we never agreed to any restriction on the buddy system in the Settlement Agreement." Ms. Gladys Campbell, a RN with 40 years of experience in hospital nursing and administration, at all levels, testified that the buddy break system is common "in every institution I've worked in in my career." Although, "...there's nothing inherently wrong with it. For it to work there are certain conditions that need to exist." She described the need for appropriate staff, including management, with a spirit of teamwork and willingness to support each other; routine responses to surge factors such as volume of patients and patient acuity; and a system that allows for interruption of the nurse on break if conditions regarding the assigned patient arise. The latter is common when a patient needs more than just observation by the breaking nurse. If these conditions exist, the buddy system allows for autonomy and flexibility. If a problem arises, within a unit, of a large number of missed breaks, overtime utilization, and a higher usage of agency nurses, staffing, among other possibility concerns, could be the cause.

Exhibit F, Page 1077 of 1092

Once agreement of the settlement was reached, Mr. Allore, Employee and Labor Relations Consultant (a MutliCare employee), prepared and presented, via assorted means, information regarding the terms and requirements of the settlement to MutliCare management and supervision. Included was the explanation that intermittent breaks, totaling 15 minutes could, when appropriate, be considered as a 15 rest break. The training also included "talking points" to be used by supervision in the various departments and units in explaining the settlement terms to employee staff (EX 24, 25).

According to Mr. Allore, during the discussions at various contractual steps of the instant grievance, the WSNA did not support the allegations contained in the grievance with specific examples of missed breaks. Further, during conference committee meetings (held monthly) and during the semi-annual staffing committee meetings, when discussing their concern regarding the missed breaks, the WSNA did not offer suggestions or solutions to the problem.

Ms. Wolfe, the Nurse Executive at Tacoma General, stated that there has been and continues to be a shortage of qualified and experienced nurses in the some of specialty areas of the hospital (E.G. Birth Center, Emergency Department within the last year. This presents significant challenges in hiring in those areas. Her testimony was supported by the information provided by the document titled, RN Vacancy Rate (EX 27). Efforts are ongoing to hire nurses to meet both FTE needs as well as qualified "on call" staff. The effort has included a continuing process of residency training for newly graduated nurses, in both 2014 and 2015 (EX 28), as well as a variety of hiring/retention bonus offers.

As Nurse Executive, Ms. Wolfe co-chairs the staffing committee.[12] This committee, a semi-annual meeting between management and the nursing staff, considers a number of items in determining the staffing needs of the 30

---

[12] The other co-chair is a registered nurse from the bargaining unit.

19

separate departments where nurses work. Such concerns as input of unit-
based councils, hours per patient day and the specific needs of those
departments based on acuity of the patients; patient churn[13] factors within
each department; nurse to patient ratio; historical census of some
departments; and appropriate information from Human Resources involving
retention and recruiting are among the items discussed in these committee
meetings.

Ms. Wolfe testified that the buddy break system, to her knowledge, was
utilized by departments prior to 2013. It is used in about 50% of the
departments, with exceptions being the operating room and other procedural
areas where nurses could schedule and take breaks between procedures.
Her understanding of the buddy break system involved nurses coordinating
their breaks with teammates or setting up a break schedule during the
beginning "shift huddle".

During Ms. Wolfe's testimony Tacoma General presented documents[14]
showing, for each department, for the time period from January, 2014 to
September, 2015, the number of productive hours worked by RN's, expected
breaks, missed breaks paid, number of missed breaks, and the percentage of
missed breaks in relation to productive hours (EX 37,38, 39). The majority
of missed breaks (88.76%) occurred in either the Emergency Department
(60.59%) or the Birth Center (28.17%).

Vivian Campbell is the Director of Women and Infant services, including the
Birth Center. She stated the buddy break system is used in the birth center,
where nurses cover for each other for their breaks. Ms. Campbell related
that this is a similar procedure to those used at other facilities where she has
worked outside of the MultiCare Health system. If a nurse is having trouble
in receiving the breaks, the nurse is expected to "interface" with the charge

---

[13]As explained by Ms. Wolfe, this is the number of discharges, admissions, patient activities, required
paperwork, etc. within each department, all of which require time from the scheduled nursing staff.
[14] These documents included a spreadsheet, graphs and charts compiled from KRONOS system data.

nurse, and "if they weren't able to resolve it, they then would go up the chain and talk with the ...either assistant manager or manager."

The birth center is an example of where a unit based council exists to discuss and resolve staffing and other problems (EX 42). Comprised of both nursing staff members and unit managers, the council meets to collaboratively insure compliance with the hospital staffing plan and provide input on staffing concerns affecting the center. Among the possible problems that influence staffing, and by extension availability of nurses for rest break purposes is the recruiting, and retention of qualified nurses to work on other than traditional day shifts. The council has not received recommendations, from council members, for a method of breaks to replace the current buddy system.

According to Ms. Grant, assistant nurse manager in Med-Surg ICU, the buddy system is also used, with apparent success, in her areas of responsibility. If a problem arises, either due to patient needs, or other reasons, not allowing a nurse to receive a break using a chosen buddy, Ms. Grant stated that either the charge nurse, if available, or herself will provide the nurse with the time for a rest break. She shared anecdotal examples of nurses who had problems adjusting to this procedure, either because they were new to the unit or "floated" into the unit, and were not used to the buddy system process.

## POSITION OF THE EMPLOYER

The burden of proof, as is customary in labor arbitration, lies with the complaining party when alleging a violation of a collectively bargained contract. The same is true here when, as agreed, the grievance/arbitration process is applied to the Settlement Agreement. The employer asserts that they have implemented "mechanisms, practices, or policies" that provide nurses at Tacoma General with the vast majority of their rest breaks and is compliance with the terms of the Agreement.

Exhibit F, Page 1080 of 1092

The employer argues that the use of the buddy system, which they contend "lies at the heart" of the grievance, does not violate the Settlement Agreement. This contention is supported by MultiCare's clear intent in the negotiation process where they continually refused to agree to a prohibition of a procedure practiced and utilized for a number of years.

It is used in a number of different departments and units where it has proven to be a workable means to provide breaks for nurses. Although the Agreement is silent on the buddy system, the WSNA's argument misconstrues the various staffing plans, which were developed with the knowledge and intention that RN's would be taking their rest breaks. The staffing committee, when developing and adopting a plan for each department or unit established RN/Patient ratios with the understanding that the nurses would be taking periodic rest breaks during their shifts.

WSNA, as part of the Settlement Agreement, committed to work cooperatively with management in communicating difficulties regarding receipt of breaks. The employer argues that it has met its requirement by creating an environment where nurses can openly communicate, without fear of retaliation or discipline, problems concerning breaks. They contend that neither the WSNA nor the local nurse representatives have provided ideas or recommendations for solving their apparent rest break concerns. They have had many opportunities, in conference committee meetings, during their unit based council meetings and while participating in the staffing committee sessions, to make suggestions or propose solutions to this perceived dilemma. They have not taken advantage of this opportunity.

The hospital asserts than even in those areas where the nurse ratio to patient is smaller, for example CCU, CVICU, ED, it is not expected that the nurse providing the break administer anything more than observation of the breaking nurse's patients. As a nurse manager testified: " I don't expect any assessments to be done, any scheduled medications to be given. It's just they're covering a short (sic) of time, just anything that comes up

22

emergently in that time." This is especially true as the nurse on break is potentially in contact via an internal phone system if the need arises and as she or he is "on the clock", they are expected to respond as necessary. The 15 minute break is not taken in isolation...other qualified staff are available in an urgent situation. A nurse would not take a break if an assigned patient was in need of immediate care.

In countering the WSNA's contention that, due to staffing, other nurses are not always available to provide a "buddy" break, the hospital argues that charge nurses and nurse managers frequently avail themselves to provide rest breaks.

MultiCare asserts that the majority of nurses at Tacoma General receive their require breaks and that Section 1 (a) (1) of the Settlement Agreement. Based on the data provided, three units, the ED, the Birth Center and MedSurg Intensive Care (MedSurg ICU), account for 64% of all missed breaks between pay periods December, 2013 through September, 2015. Excepting the ED and the Birth Center, all of the units receive at least 80% of their rest breaks; all but four receive at least 85%; and other units receive 90% of the allowable breaks. In 27 units other than the ED, Birth Center and MedSurg ICU, nurses receive 93.1% of the rest breaks.

Pursuant to the settlement, the WSNA has an obligation to cooperatively assist in implementing systems to provide breaks for the nurses. The employer argues that since the Association suggests that intermittent breaks do not constitute a contractually mandated 15 minute break and they encourage the represented nurses to not consider intermittent breaks, as an actual break, the absence of 15 consecutive minutes on a break, should be not be recorded as a missed break.

The WSNA has focused it's argument on two departments, the ED and the Birth Center; two departments with the most missed breaks. It also relies on

23

the CCU and CVICU departments for supporting it's position. These latter two, however, are receiving 94% and 95.4% of their breaks. The other 26 departments receive a substantial number of rest breaks. The ED and the Birth Center are unique in a number of ways. The Birth Center has significant staffing problems, due to multiple retirements, loss of part-time nurses, and a number of nurses on long-term medical leave. The ED has adopted a newer break system using float nurses, charge nurses, and improved management tools to provide nurses with their breaks. Both departments are improving.

## POSITION OF THE ASSOCIATION

The terms of the Settlement Agreement required the hospital to establish a means in which missed rest breaks were rare and the hospital staffing plan would not be violated when nurses took their breaks. The evidence showed that missed breaks were not rare, and in fact, increased after the settlement was reached. Testimony showed that nurses consistently were not relieved for rest breaks with possible adverse effects for themselves and their patients. The use of the buddy system to enable nurses to take their breaks, requiring nurses to care for twice the number of patients allowed under the staffing plan, was used and unsuccessful in a number of departments and units.

The Settlement Agreement sets forth the employer's obligation to both provide nurses with break relief and to avoid violating the hospital staffing plan. By not adhering to the terms of the Agreement the hospital, by failing to adequately relieve nurses puts the nurses into the impossible situation of having to "abandon" their patients for a period of time, and places the nurses at great professional risk should an adverse event occur while absent from their assigned patients.

During settlement agreement negotiations the hospital attempted to include language allowing for continuation of the buddy system. The Association

24

rejected any reference to this system in the agreement. The WSNA contends the Agreement required the hospital to make significant changes in the way in which it provided nurses with rest breaks, but no meaningful changes have been made with the results of leaving nurses "just as badly off as they were before the lawsuit was brought." During the three years prior to the lawsuit the number of missed breaks recorded climbed from a little over 2,000 per quarter to nearly 6,000. Subsequent to the Settlement, even with the hospital's agreement to implement new "mechanisms, practices and policies" the problem grew. By mid- 2015, missed rest breaks greatly exceeded that number.

Evidence surrounding the lack of rest breaks was presented regarding the Emergency Department (ED) and the purported new way of providing breaks. Several examples, and problems, regarding the use of float nurses were offered. The WSNA contends that even if the hospital intended the new schedule, and procedure, to result in improvements, the rate of missed breaks in the ED continued to be nearly 60% after the changes went into effect. The rate of missed breaks in the ED is almost 20% higher than when the Settlement went into effect. This was not a successful mechanism or practice for providing rest breaks.

The Birth Center had the second highest rate of missed breaks in the hospital. Here nurses are expected cover for each other, but due to the fact that most of the patient require 1 to 1 monitoring, such a break system in often difficult or impossible. When the "buddy system" does not work, nurses are expected to utilize a charge nurse, or a nurse manager, to cover breaks. These nurses are not always available as they have their own duties to perform.

The WSNA asserts that it is the hospital's responsibility and obligation, based on state law, the parties' collective bargaining contract, and the Settlement Agreement; to ensure that conditions exist to allow nurses to receive rest

25

breaks. Citing the law, administrative procedures, and court cases, the WSNA supported it's position affirming both the legality and need for rest breaks in the workplace. Requiring, encouraging or expecting employees to work through their rest breaks creates an unacceptable culture deriving employees of the benefit of an allowable rest during their scheduled hours of work. The WSNA contends that, based on testimony of some nurse managers, the hospital attributes missed breaks, in some departments, to such a culture.

The employer, by using the buddy system in about one half of the units, is violating the staffing plan and the ratios contained in the plans. They contend, as reflected in their exhibit presenting the 2014 staffing plan (UX 14) that the ratio for each department specifically lists the number of patients assigned to each nurse. By using the buddy system, the WSNA alleges the ratio is doubled for each nurse when she or he substitutes for another nurse to allow for a break. This doubling of responsibility could put the nurse's license in peril if a mistake is made or a problem occurs with the extra patients. Further, it could likewise put the nurse on break at equal risk if the nurse "has abandoned" her/his patient by transferring care responsibility if an urgent issue arose. By requiring this system, the hospital is in violation of the Settlement Agreement each time a nurse is required or expected to care for patients beyond the ratio listed in the most current staffing plan, even if that care is merely "observation of a patient" for 15 minutes. This is especially true, according to the WSNA, when the term ratio, during discussion of the staffing plan in negotiation, was not changed to something other than a clear and simple meaning.

The Union also argues that the lack of rest breaks has the effect of potential harm to the nurse from lack of rest, fatigue, and increased job related stress. It could also lead to harm to the patient by compromising safe patient care.

Exhibit F, Page 1085 of 1092

The Association notes that the Settlement Agreement includes the language, "in the rare case that a missed break occurs," overtime must be paid. It argues that to achieve this language, and the "modest" financial component of overtime pay, the Union gave up its right to further monetary gain in back pay and extraordinary compensation. The evidence shows that missed breaks are not rare. The Union contends that even the total missed breaks as a percentage of all nurses, for the period of December 2013 to September, 2015, at 13.7%, supports the reasoning alleging a violation of the Settlement Agreement (EX 37).

The Union supported it's position by suggesting that the bargaining history surrounding the Settlement Agreement clearly shows the intent of the parties to resolve this lawsuit and provide for rest breaks. The Union adamantly opposed inclusion of the buddy system in the Agreement; the hospital equally was firm in its resolve to not tie a percentage of missed breaks into a requirement for specific staffing changes.

The WSNA asserts that the Arbitrator has the authority here to determine a need for staffing changes. Citing a number of arbitration decisions, as well as an analysis of the contract, the Union contends that the discretion of the employer to make staffing decision is relinquished by the terms of the contract, the Settlement Agreement and by the inclusion of nurse input in the staffing plan.

## ANALYSIS AND DECISION

It is understood in labor arbitration that when the issue is one of contract interpretation, the burden of proof lies with the grieving party. The evidence and testimony presented and received here is sufficient to find that this burden has been met. The arguments of both MultiCare and the WSNA were sound and thorough, but I am more persuaded by those advanced by the Union. The grievance, therefore, is sustained.

27

MutliCare's unwavering position during the negotiations for the terms of the Settlement Agreement was to continue to be able to use the buddy system for purposes of providing rest breaks. Although not specifically written or referenced as part of the final agreement, the inclusion of "mechanisms, practices or policies" was the concession that would allow for the employer to maintain and continue the application of this system. Equally resolute in it's stance, the WSNA insisted that the buddy system not be a part of the Settlement. As expressly described it was not included.

The buddy system is used, in many units and departments, as the means by which nurses are relieved for their rest breaks. This use, however, as a method to provide for rest breaks violates the terms of the Agreement, in both application and purpose. The Settlement Agreement, at Section 1, a (1), requires MultiCare to adopt mechanisms, practices or procedures that *assure* each represented nurse is relieved of patient care duties for a 15 minute rest break for every four hours worked (emphasis added). The evidence and testimony presented during this arbitration process, as well as statistics supplied by MultiCare proved that this assurance has not been achieved.

The contract allows for "a paid rest period of fifteen (15) minutes for each four (4) hours of working time." Further, MultiCare has, in Article 2 – Management Responsibility, the contractual obligation "to determine job assignments and working schedules..." in such a manner that these actions "shall not be exercised so as to violate any of the specific provisions of this Agreement." By allowing various units and departments to use the buddy system as a means to provide breaks, without specific managerial direction, the Employer has failed to meet this obligation. To expect nurses to "work out" their rest breaks with their colleagues, can be both inconvenient and burdensome as a means to plan breaks, seek out a buddy, and arrange for actual time away from the nurse's assigned patients. If problems exist in arranging for a break, the nurse is expected to seek help from supervision.

28

This has proven, in some units, to be untenable. The responsibility for fulfilling the promise of rest breaks lies with the employer. It is especially unworkable in those departments that have unpredictable census, patients in exceptional distress, and a low ratio of nurse to patient. As noted by Ms. Gladys Campbell, when discussing this break system, "...there is nothing inherently wrong with it, for it to work there are certain conditions that need to exist..." She posited the need for appropriate staff, including management, with a spirit of teamwork and willingness to support each other; routine responses to surge factors such as volume of patients and patient acuity; and a system that allows for interruption of a nurse on break if conditions regarding the assigned patient arise. This system, according to Ms. Campbell, allows for autonomy and flexibility. If a problem arises, she stated, within a unit, of a large number of missed breaks, overtime utilization and a higher usage of agency nurses, staffing, among other possible concerns, could be the issue. Ms. Campbell did not, however, address the effect this break system has on the ratio of nurse to patient as contained in the hospital's staffing plan.

Testimony indicated that the buddy system is in place in a majority of units or departments in the hospital. Information, in the form of bar graphs, spread sheets, and other documents, offered clear information that the buddy system is not working as expected and does not meet the Agreement requirements of adopting a system to relieve nurses for their rest breaks. From the period of January 2014 through September 2015 the nurses missed a total of 13.73% of the expected breaks. During the same period, the ED missed 60.59% of expected breaks; the Birth Center 28.17%. Other units ranged from 20.65% missed breaks in Post Anesthesia to 6.97% in CVICU. A group of units or departments, with a lesser number of expected breaks showed little or no missed breaks (EX 37). The ED instituted a revised break system, with scheduled float nurses used to relieve for breaks, in July 2015. This revised system, however, was ineffective due to poor implementation and utilization.

29

The employer argues that the buddy system is an acceptable way for nurses to receive their rest breaks. Apparently, the employer is satisfied with a hospital-wide 13% missed breaks and considers this number to equate to a rare occurrence with the required monetary penalty of overtime pay.

The Settlement also includes, in Section 1. a. (1) that "In no case shall the mechanism used result in a violation of the staffing plan established by the Nurse Staffing committee." The issue, according to the WSNA, goes far beyond the mere number of missed breaks or payment for those missed breaks. Their argument is the effect that the buddy system has on the nurses' professional responsibility when being relieved. They contend that the nurse providing the break now has a nurse to patient ratio, that doubles when the nurse "buddy" takes over the healthcare of their assigned patients. Witnesses for the hospital stated that only basic or "observational" care (answering call lights, checking on IV's, etc.) was provided during these breaks, and that any other patient care needs could be administered by the assigned nurse, either before break or after. The nurse, on break but on call for urgent circumstances, continues to feel the professional and legal responsibility for the assigned patients.

The requirement of a nurse on a break to be "on call" diminishes the purpose of a break from work. Nursing requires knowledge, experience, dedication and concentration, tempered with compassion and patience, to successfully care for patients in need. The related stress, both physically and mentally, warrant occasional time away from their assigned task. The nurse on break should be free from worry and concern, with the knowledge that the nurse's colleague is providing the necessary attention to the assigned patients. If that nurse has her/his own patients, doubling the potential workload, even for 15 minutes, the time away from work is not really a break.

Exhibit F, Page 1089 of 1092

The State law establishing the requirement of a staffing committee, a part of Title 70, Public Health and Safety, subsection 70.41.410, Staffing Committee – definitions – (b) states, "…Hospitals and nursing organizations recognize a mutual interest in patient safety initiatives that create a healthy environment for nurses and safe care for patients." A plan meeting the criteria included in RCW 70-41-420, Nurse Staffing Committee (3) (a) (ii) "Level of intensity of all patients and nature of the care to be delivered on each shift:" This latter criterion was met by the committee's listing of the ratios of nurse to patient for each clinical unit. The final report, sent for CEO approval, dated February 2, 2015 established the ratios for 2015. Although addressing challenges of staffing, including scheduling, vacancies, turnover, and other unexpected needs, the staffing report did not advocate a process or method for scheduling breaks for the nurses. The section listing the staffing models for each clinical area, suggested the nurse/patient ratio, proposed supervision, support personnel, but was silent on assuring rest breaks for nurses.

The assurance that each nurse is relieved of patient care for the contractually mandated rest period as required by the Settlement Agreement, without resulting in a violation of the staffing plan is nonviable using the buddy system. To meet these requirements, each unit or department must establish a process to relieve nurses for their rest break. This may include an increase in staff, designated relief duties to a scheduled nurse, or the use of nurses floating from other units. During the hearing, other than anecdotal examples at a few other hospitals, no evidence was presented, by either side, showing how other hospitals handle this issue. Most, if not all, Washington State hospitals have State compulsory staff planning committees. These plans, if researched, could provide additional information, and possible options, to the establishment of a viable rest period procedure.

WSNA, as part of the Settlement Agreement, committed to work cooperatively with management in communicating difficulties regarding receipt of breaks. The employer argues that it has met it's requirement by

31

creating an environment where nurses can openly communicate and share, without fear of retaliation or discipline, problems concerning breaks. They contend that neither the WSNA nor the local nurse representatives have provided ideas or recommendations for solving their apparent rest break concerns. They have had many opportunities, in conference committee meetings, during their unit based council meetings and while participating in the staffing committee sessions, to make suggestions or propose solutions to this ongoing dilemma. As will be noted in the AWARD, *infra*, WSNA input will be an important and required part of a solution to this issue.

The evidence shows that the employer has been unsuccessful in its efforts to support the terms of the settlement, by failing to provide a means for which the nurses covered, are and will be able, to receive the rest breaks afforded them by the contract, the Settlement Agreement and State Law. All though the nurses are paid for the missed breaks, it is apparent that the actual break from the rigors and stress of their nursing duties is of paramount importance. I find that the employer violated the terms of the Settlement Agreement by failing to adopt and provide mechanisms, practices or policies procedures that would give the opportunity and means for the represented nurses to take their rest breaks. The grievance is sustained.

Both the employer and the WSNA offered several suggestions pertaining to remedies. All were carefully considered.

# AWARD

1. The grievance is sustained.

2. In order to assure that each nurse receives the rest breaks established by the Settlement Agreement, the hospital shall, no later than the pay period nearest to January 15, 2016, cease from using the buddy system as a means to provide rest breaks.

3. When determining future schedules, each unit or department, for each shift, shall staff, schedule, and assign a nurse to serve as a reserve or float nurse with the precise assignment of relieving other scheduled nurses for their authorized breaks. Such schedules shall be effective no later than the pay period nearest to January 15, 2016.

4. The staffing committee, or a sub-committee comprised of an equal number of represented nurses and nurse management, shall, within 30 days of the date of this decision, convene to discuss and determine a mutually acceptable process to resolve the issue(s) raised herein regarding compliance with the Settlement Agreement. Any process or method shall not violate or change the established staffing plan as it relates to the ratio of nurse to patient. The committee shall meet as frequently as necessary to reach a decision.

5. In the event the staffing committee or sub-committee fails to arrive at a mutually acceptable solution to the issue(s) by June 30, 2016, the parties will each submit their last, best position to the undersigned, with their rationale in support of their position, either in writing or by presentation in a hearing. The undersigned shall choose one of the two positions, without modification. Such choice shall be final and binding on the parties. Costs of this process will be shared equally.

6. The undersigned shall retain jurisdiction to resolve any dispute arising from the implementation of this Decision and Award.

Respectfully submitted,

Douglas P. Hammond
Arbitrator
December 28, 2015